IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

HENRY CHAVEZ,

        Plaintiff,

vs.                                              No. CIV 00-92 LH/LFG

ROBERT PERRY, et al.,

        Defendants.

**MAGISTRATE JUDGE'S ANALYSIS AND RECOMMENDED DISPOSITION
ON NMCD DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
AND TO DISMISS PLAINTIFF'S REQUEST FOR INJUNCTIVE RELIEF[1]**

      This is a *pro se, in forma pauperis* civil rights action pursuant to 42 U.S.C. § 1983. Plaintiff Henry Chavez ("Chavez") is a state inmate who complains that, in the course of a series transfers among various correctional facilities in New Mexico between October 1997 and September 1999, he was subjected to numerous threats, physical assaults, and mistreatment by other inmates and, on one occasion, by prison guards.

      He sues corrections officials, alleging deprivation of due process in that they failed to provide him with notice and a hearing before transferring him from protective custody into the general prison population, violation of the Eighth Amendment by deliberate indifference to his safety, and a state law

---

[1] Within ten (10) days after a party is served with a copy of this legal analysis and recommendations, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such analysis and recommendations. A party must file any objections with the Clerk of the U.S. District Court within the ten-day period allowed if that party wants to have appellate review of the analysis and recommendations. If no objections are filed, no appellate review will be allowed.

claim for intentional infliction of emotional distress. He seeks an injunction and compensatory and punitive damages. By order dated April 13, 2000, Judge Bruce D. Black dismissed certain claims and parties from the case [Doc. 5]. Other claims are the subjects of two separate motions to dismiss, currently pending before the Court, in addition to this motion for summary judgment.

Defendants Jeff Serna ("Serna") and Donna Martinez ("Martinez"), both employed in the Classification Bureau of the New Mexico Corrections Department ("NMCD"), bring this Motion for Summary Judgment [Doc. 21], seeking dismissal of Count II of Chavez's complaint. Count II alleges, *inter alia*, that Serna and Martinez made the decision to transfer Chavez, first, to the Torrance County Detention Facility ("TCDF"), and later to the Lea County Correctional Facility ("LCCF"), knowing that these two facilities had violent environments and a history of inmate assaults, knowing that neither of these prisons had adequate facilities or staff to house protective custody inmates such as Chavez, and knowing that he would be particularly vulnerable to attack by general population inmates at TCDF and LCCF. These actions, Chavez alleges, constitute deliberate indifference to his safety, in violation of the Eighth Amendment ban on cruel and unusual punishment.

In addition, Serna and Martinez seek dismissal of Chavez's demand for an injunction. In his prayer, Chavez asks that the Court award damages, both compensatory and punitive, as well as various forms of injunctive relief. Serna and Martinez argue that Chavez has not established the requisite elements for injunctive relief. For reasons given below, the motion for summary judgment on Chavez's Eighth Amendment claim should be granted, and claim for injunctive relief should be dismissed.

**Claim of Eighth Amendment Violation**

  A.  Standards for Deciding the Motion

      1.  Standards for Summary Judgment

Summary judgment is appropriate when the moving party can demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 90 S. Ct. 1598 (1970); Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co., 52 F.3d 1522, 1527 (10th Cir. 1995). The party moving for summary judgment has the initial burden of establishing, through admissible evidence in the form of depositions, answers to interrogatories, admissions, affidavits or documentary evidence, that there is an absence of evidence to support the opposing party's case and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S. Ct. 2548, 2554 (1986).

Once the moving party meets its burden, the party opposing the motion must come forward with specific facts, supported by admissible evidence, which demonstrate the presence of a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49, 106 S. Ct. 2505, 2510 (1986); Biester v. Midwest Health Servs, Inc., 77 F.3d 1264, 1266 (10th Cir. 1996). The party opposing the motion may not rest upon the mere denials of his pleadings to avoid summary judgment. Fed. R. Civ. P. 56(e); Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991).

"The mere existence of a scintilla of evidence in support of the nonmovant's position is insufficient to create a dispute of fact that is 'genuine.'" Lawmaster v. Ward, 125 F.3d 1341, 1347 (10th Cir. 1997). Summary judgment is appropriate only if there not sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict for that party. Anderson, 477 U.S. at 249,

106 S. Ct. at 2511. Thus, the court's inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id., at 251-52, 106 S. Ct. at 2512. The court in considering a motion for summary judgment construes the factual record and the reasonable inferences therefrom in the light most favorable to the party opposing the motion. Perry v. Woodward, 199 F.3d 1126, 1131 (10th Cir. 1999), *cert. denied*, __ U.S. __, 120 S. Ct. 1964 (2000).

### 2. Elements of Eighth Amendment Cause of Action

In Count II, Chavez alleges that Serna and Martinez, by their actions in transferring him to the privately-run TCDF and LCCF, which do not have adequate facilities or personnel to house protective custody inmates, knowingly placed him at risk of attack by violent inmates. A prisoner has the right under the Eighth Amendment to be reasonably protected from constant threats of violence from other inmates, and a prison official's deliberate indifference to a substantial risk of serious harm to an inmate violates the ban on cruel and unusual punishment. Riddle v. Mondragon, 83 F.3d 1197, 1204 (10th Cir. 1996). "Being violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.'" Id., *quoting* Farmer v. Brennan, 511 U.S. 825, 834, 114 S. Ct. 1970, 1977 (1994).

To recover on an Eighth Amendment claim for failure to protect, an inmate must allege and prove two elements: (1) that he is incarcerated under conditions posing a substantial risk of serious harm; and (2) that the prison official has a sufficiently culpable state of mind, indicative of deliberate indifference to the inmate's health and safety. Riddle, at 1204; Grimsley v. MacKay, 93 F.3d 676, 680 (10th Cir. 1996). The deprivation alleged must be, objectively, "sufficiently serious" to warrant judicial intrusion. Farmer, 511 U.S. at 834. The second element of the Eighth Amendment claim is

a subjective, and not an objective, one; that is, in order for liability to attach, the official must be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must in fact draw the inference. Farmer, 511 U.S. at 837.

The question to be decided on this motion, therefore, is whether a genuine issue of material fact exists as to the elements of the Eighth Amendment cause of action; that is, whether there is sufficient evidence that a jury could find that Chavez was subjected to a substantial risk of serious harm, and that Serna and Martinez were aware of facts from which they could and did draw the inference that such a risk existed, and were nevertheless deliberately indifferent to Chavez's plight.[2] The Court finds no genuine issue of material fact as to the second element of the Eighth Amendment claim and therefore recommends that Defendants' motion be granted.

B. Factual Allegations

Chavez's complaint is 26 pages long and contains 115 separate paragraphs, as well as a prayer for relief. His Eighth Amendment claim against Serna and Martinez boils down to the following allegations:

---

[2]Serna and Martinez have appended to the memorandum in support of their summary judgment motion their own affidavits, and copies of correspondence between Chavez and the Classification Bureau. In response, Chavez filed a "Motion for Extension of Time and Request to Deny the NMCD Defendants' Motion for Summary Judgment" [Doc. 23]. The motion for extension of time was denied by order dated August 24, 2000 [Doc. 38]. In the meantime, Serna and Martinez filed their Response [Doc. 27] to Chavez's motion for extension of time, which was docketed as both a Response to Chavez's motion for extension, and a Reply to Chavez's Response to the motion for summary judgment. Thereafter, Chavez filed his Reply to the Response to his motion for extension, labeled also a "Request to Deny the NMCD Defendants' Motion for Summary Judgment" [Doc. 30], docketed as both a Reply to the Response to the motion for extension, and as a Surreply to the original motion for summary judgment. Chavez attached to this last document three exhibits: his own unsworn "declaration," the "declaration" of Marcus Carter, and a copy of an executive summary of the January 14, 2000 consultant's report on prison operations in New Mexico. Doc. 30 is accepted as a surreply to the motion for summary judgment, although Plaintiff did not seek leave of Court to file a surreply as required by D.N.M.LR-Civ. 7.6(b). The Court considers the summary judgment motion fully briefed and ready for decision.

Chavez asserts that Serna made the decision to transfer Chavez to TCDF in February or March, 1998, and that at the time Serna made this decision, he was aware that TCDF did not have adequate facilities to house protective custody ("PC") inmates such as Chavez. At TCDF, Chavez was "showcased" to the general population ("GP") inmates as a PC and thus was set up as a target for abuse and assault. He was in fact subjected to threats and harassment by other inmates in which they yelled, kicked, and urinated on him. On June 20, 1998, and again on July 25, 1998, he was physically attacked by GP inmates in the prison law library.

Serna next made a decision to transfer Chavez to LCCF, where he was sent on August 1, 1998. Again, Chavez alleges, Serna knew that LCCF did not house PCs and did not have the facilities or adequately trained staff to protect such inmates. At LCCF, he was assaulted by another inmate on August 5, 1998. Two days later, two corrections officers shoved him against a wall and punched him. On August 8, another corrections officer propped open the door to the PC pod so that GP inmates could get in and attack Chavez. One inmate kicked him in the groin, causing permanent injury to his testicle.

Chavez was next moved to Southern New Mexico Correctional Facility ("Southern") on September 14, 1998, where he was assaulted and stabbed in the arm by inmates who, he says, were gang members who had been transferred to Southern from LCCF shortly after he was, the implication being they knew that he had been on PC status at LCCF. On March 19, 1999, Chavez was transferred to Central New Mexico Correctional Facility ("Central"), where gang members assaulted him in the yard, striking him on the jaw and the back of his head. The assailants said they knew that Chavez had been a PC while at LCCF.

Following another series of transfers, Chavez ended up again at LCCF on September 13,

6

1999. He was assaulted on the transport bus going to LCCF; inmates spit at him and struck him on the back of his head. He was threatened by other inmates who tried to break into his housing unit, yelling, kicking, lighting fires, and flooding the pod with dirty toilet water. In the shower, inmates spit and threw urine at him.

### C. Knowledge by Serna and Martinez of Risk of Serious Harm to Chavez

There is insufficient evidence to go to the jury on the issue of whether Martinez or Serna were aware of facts which would lead them to draw the inference that Chavez's transfer to either TCDF or LCCF placed him at substantial risk of serious harm. As noted above, the standard on the second prong of the "deliberate indifference" test is a subjective one, in that it is not enough that the official should have been aware of the risk of serious harm; rather, he or she must actually have known. Craig v. Eberly, 164 F.3d 490, 495-96 (10th Cir. 1998).

It is true, as Chavez points out, that when a party's state of mind is at issue, summary judgment is generally inappropriate. Seamons v. Snow, 206 F.3d 1021, 1027 (10th Cir. 2000). However, summary judgment can be granted, even in a case involving allegations of deliberate indifference in the prison context, if the "plaintiff's allegations . . . implicate only defendants' negligence and do not establish the more culpable state of mind necessary to support claims of the denial of a constitutional right." White v. Colorado, 82 F.3d 364, 367 (10th Cir. 1996).[3]

---

[3] S*ee also*, Blumhagen v Sabes, 78 F.3d 597 (Table, text in Westlaw), Nos. 94-8022, *et al.*, 1996 WL 91116 (10th Cir. Mar. 4, 1996) (affirming summary judgment on claim of Eighth Amendment violation, and rejecting plaintiff's contentions that summary judgment was inappropriate because state of mind was at issue and because the district court refused to allow discovery before granting summary judgment); Lee v. Shephard, 986 F.2d 1427 (Table, text in Westlaw), No. 92-7029, 1993 WL 53586 (10th Cir. Feb. 22, 1993) (affirming summary judgment where plaintiff "failed to assert any allegations regarding a culpable state of mind on the part of Defendant prison officials"); May v. Oklahoma Dept. of Corrections, 215 F.3d 1337 (Table, text in Westlaw), No. 99-6267, 2000 WL 633244 (10th Cir. May 17, 2000) ( affirming summary judgment on a deliberate indifference claim).

Chavez alleges that Serna and Martinez knew that TCDF and LCCF had violent environments, knew that facilities and staff at TCDF and LCCF were inadequate to handle PC inmates and thus could not meet Chavez's needs, and knew that Chavez would be particularly vulnerable to attack by general population inmates at those facilities, and, in spite of this knowledge, they approved his transfer to TCDF and LCCF and failed to respond when he reported that he had been the target of assaults and improper treatment. However, the Court finds no genuine issue as to Serna's and Martinez's knowledge, nor as to any intentional, reckless, or wanton failure on their part to respond to Chavez's reports.

1. Defendants' General Knowledge

Chavez alleges that he provided specific notice of his individual circumstances to Serna and Martinez by way of letters and by speaking directly to Martinez on one occasion; these allegations will be discussed in greater detail below. In addition, however, Chavez also implies that Serna and Martinez were generally aware, or should have been aware, that TCDF and LCCF were not equipped to handle protective custody inmates and were further aware that the classification system of the Department of Corrections was flawed, and their actions in placing Chavez in these institutions, without adequate classification procedures, constitutes deliberate indifference. The Court rejects this argument.

As noted above, a prison official is not liable under the Eighth Amendment unless the plaintiff can show that the official was actually, subjectively aware of a serious threat to the inmate's safety. It is not enough that the official should have been aware of the risk. Craig v. Eberly, *supra*, at 495-96. Chavez's allegation that Serna and Martinez "had a duty to know" whether TCDF and LCCF could safely provide for his needs as a protective custody inmate (Plaintiff's Surreply, at 4), states no

more than that they should have been aware of a risk. Both Serna and Martinez assert in their respective affidavits that they were not aware of any risk to Chavez at the two private prisons, arising solely from his status as a PC inmate, which would have affected the decision to place him there. If, after such placement, he was later treated inappropriately by local prison officials (*e.g.*, he alleges he was "showcased" as a PC inmate, and that corrections officers allowed GP inmates into the PC housing unit, looking the other way while Chavez was beaten), there is no indication that Serna or Martinez knew that his would occur.

Chavez includes with his briefing a copy of an executive summary of "The Consultants' Report on Prison Operations in New Mexico Correctional Institutions," dated January 14, 2000 (Exhibit A to Plaintiff's Surreply [Doc. 21]), hereafter referred to as "Consultant's Report." The report sets out problems that have arisen in both public and private prisons in New Mexico, including problems with inmate classification systems (*see*, Consultant's Report, E-8 to E-12; other mention of classification issues occurs at E-7, E-13, E-14, E-16, E-17, E-21, E-24). The Report makes only brief reference to protective custody inmates, noting that inmates are allowed to request PC status without providing specific information to support their claims, so that there is no record of safety concerns reported by an inmate. (Consultant's Report, at E-17). This statement does not support the assertion that Serna and Martinez were aware of, and ignored, a substantial risk to Chavez. In addition, the Court notes that the report was prepared in January 2000 and was based on a study of the state prison system which commenced on September 19, 1999. It does not establish that Serna and Martinez were aware of risks to Chavez, at the time Serna approved his transfer to TCDF in February 1998, nor to LCCF in August 1998, nor back to LCCF on September 13, 1999.

No further evidence has been produced to show that either of these Defendants was generally

9

aware that problems existed in the classification system which put Chavez at risk. His conclusory allegations that they were so aware, and that they were deliberately indifferent to his needs, do not preclude summary judgment on this issue.

### 2. Defendants' Specific Knowledge Regarding TCDF

With respect to Defendants' alleged knowledge of a risk at TCDF, Chavez asserts that he wrote a letter to Serna on March 30, 1998, shortly after his transfer there, requesting that he be transferred back to long term protective custody at Southern and advising Serna of "his enemy status" at TCDF. He says he wrote again on April 11, 1998, providing reasons for this request. Martinez responded to both letters, the second time informing Chavez that his request for transfer to Southern had been approved.

Copies of this correspondence is attached to Defendants' memorandum in support of their motion. It reveals that Chavez wrote a letter to Serna on March 30, 1998, in which he stated that he requested voluntary segregation as soon as he arrived at TCDF because he had enemies there, and that "this facility cannot meet my institutional needs." He requested transfer back to Southern but added, "If I have to wait, I will be glad to do so because if I end up going to another facility I will end up back in segregation because of my enemy status in the other facilities." (All correspondence between the parties is contained in an attachment labeled as "Exhibit 1," to Exhibit B to Defendants' Memorandum).[4]

Defendant Serna states in his affidavit that he did not read any of Chavez's letters, because Martinez, who is Serna's assistant, is assigned to respond to all correspondence from inmates.

---

[4] Exhibit B to Defendant's Memorandum is the affidavit of Defendant Donna Martinez, hereinafter referred to as "Martinez Affidavit."

10

(Exhibit A to Defendant's Memorandum, at 3).[5] On April 6, 1998, Martinez responded to Chavez's first letter, informing him that the Classification Bureau could not act on his request until it received the proper notice from TCDF; in reply, Chavez wrote to Martinez on April 11, 1998, informing her that TCDF had told him the transfer was being processed. He said in this letter:

> This institution cannot meet my needs and at this point is denying me access to Law Library and my [illegible; could be "one hour"] of recreation. I have ongoing litigation in the courts at this time and I may be loosing [sic] one of my cases because of my possession here at TCDF and the denial of my rights to have access to a Law Library. I have been on voluntary segregation for over one month now and have only been allowed to go to the Law Library two times even though I have requested it every day. My transfer is therefore very urgent.

Martinez responded to this letter on April 17, 1998, telling Chavez that his request for transfer to Southern had been approved, that his name had been placed on a waiting list, and he would be transferred as soon as space was available.[6] During his stay at TCDF, and after the letters were written, he was assaulted in the prison law library, once in June and again in July, 1998.

This correspondence does not establish that Serna and Martinez were aware of a serious risk of harm to Chavez at TCDF. Martinez did read and respond to Chavez's letters, but she says that none of his correspondence revealed that he was clearly at risk of being assaulted by other inmates an any of the institutions to which he was transferred. (Martinez Affidavit, at 3). Chavez stated in his March 30, 1998 letter that he had enemies at TCDF and requested that he be transferred back to PC status at Southern. However, he also said in the letter that he had enemies "throughout the

---

[5] Exhibit A to Defendant's Memorandum is the affidavit of Defendant Jeff Serna, hereinafter referred to as "Serna Affidavit."

[6] Chavez was not in fact transferred back to Southern; rather, he was one of several hundred inmates who were sent to LCCF, as an emergency measure, on August 1, 1998.

system," indicating that the enemy situation at TCDF was not unique. In addition, he stated he would "be glad" to wait for the transfer, if necessary. Martinez says that Chavez's statement in the March 30 letter, that he was in PC status at TCDF, indicated to her that he was not in danger of assault by other inmates. He did not complain that he was in such danger. He said that TCDF could not meet his institutional needs, but that term generally refers to needs such as education and work, and he did not clarify further nor exhibit any fear of attack by other inmates. (Martinez Affidavit, at 3-4).

In his April 11, 1998 letter, Chavez again made no mention of fears for his safety; rather, he complained about lack of law library time. He did state in the letter that he was in voluntary segregation, which indicated to Martinez that he would be safe until he could be transferred to Southern. Martinez states generally that she had no knowledge or reason to believe that Chavez was at substantial risk of being assaulted by inmates at TCDF (Martinez Affidavit, at 2), and there is nothing in this correspondence which refutes that statement. In addition, although Chavez states that he was assaulted by GP inmates in the law library at TCDF in June and again in July, 1998, there is no indication that he included this information in any letters that he wrote to Serna or Martinez after the attacks occurred. Martinez states also that she did not have responsibility for making the decision to transfer Chavez to TCDF (nor to LCCF, on the two occasions he was transferred to that facility). (Martinez Affidavit, at 7).

Serna says in his affidavit that he had no knowledge that TCDF could not adequately house PC inmates and had no knowledge of a substantial risk to Chavez at that facility. (Serna Affidavit, at 1-2). He states further that the reason for Chavez's transfer to TCDF was because of lack of space at Southern, his previous place of incarceration. (Serna Affidavit, at 4; and Exhibit 1 to Serna Affidavit). Serna states also that he does not read correspondence from inmates, since Martinez

12

handles that task, and that he did not read these letters from Chavez. (Serna Affidavit, at 3). Even if he had read the letters, there is nothing in them, as noted above, which could have provided notice to Serna that Chavez was at substantial risk of harm at TCDF.

In short, there is no genuine issue of material fact that either Serna or Martinez was aware of a substantial risk of serious harm to Chavez at TCDF, and he has therefore failed to make out a case for the jury that the decision to transfer him to TCDF in the first place, and to keep him there from February to August 1998, constituted deliberate indifference on the part of either of these Defendants.

### 2. Defendants' Specific Knowledge Regarding LCCF

Chavez was sent to LCCF, the first time, on August 1, 1998. He remained there for approximately six weeks, until September 14, 1998. After he left LCCF following this first stay, he was transferred to several other institutions,[7] but eventually ended up back in LCCF on September 13, 1999. He was still at LCCF at the time he filed his complaint in this action.     Serna states in his affidavit that Chavez's first transfer to LCCF was done as an emergency measure, rather than through the normal classification process, because the Corrections Department's contract with TCDF had expired and inmates who had been housed there had to be moved *en masse*. Chavez was one of several hundred inmates transferred at this time. Serna says that he had no knowledge that LCCF was unable to safely house PC inmates; in fact, one of the reasons Chavez was sent there was because he had no known enemies at LCCF at that time, and Serna therefore thought LCCF would be safe for Chavez. (Serna Affidavit, at 4).

---

[7] One of these facilities was Southern. Although Chavez alleges he was assaulted on two occasions at Southern, he himself requested that transfer, and he does not claim that the decision by Serna or Martinez to transfer him there constituted deliberate indifference. He does allege that these assaults were perpetrated by gang members who knew him from LCCF, but he makes no allegation that Serna or Martinez had any liability for these attacks.

Chavez alleges that during his first stay at LCCF, he was assaulted by inmate Donald Looney on August 5, 1998, shoved against the wall in his cell and beaten by corrections officers on August 7, 1998, and suffered permanent injury and disfigurement on August 8, 1998 when he was kicked in the groin by another inmate while officers stood by and either did nothing or actively assisted the attackers by allowing them access to the PC pod.

On August 14, 1998, Chavez wrote a letter to Martinez. He stated that he wished to be transferred to Southern and, although he had been told that this request was approved, he somehow ended up at LCCF instead. He told Martinez that he had placed himself in voluntary segregation at LCCF and complained that, as a PC inmate, he was not allowed law library access, recreation, and could not work or go to school. He said that he had enemies at LCCF but did not mention the August 5, 7, and 8 incidents described in his complaint, not even the alleged attack by prison guards. His complaint refers only to lack to access to recreational and other opportunities.

As noted above, Serna says he did not read any of Chavez's letters, including the August 14, 1998 one. In any case, Martinez says that there was nothing in the letter to alert her, and presumably to alert Serna if he had read it, to any danger to Chavez. In the letter, Chavez did not report any attacks, did not tell Martinez he was in fear of being assaulted, and did not mention any concerns about the facility's ability to safely house him in PC status. (Martinez Affidavit, at 5).

Martinez wrote back on August 27, 1998 and told Chavez that there had been no recommendation from LCCF to transfer him to Southern, and that he would not necessarily be approved to go there. She told him that, in the meantime, he would continue to be afforded PC status at LCCF as long as he felt in he needed it. As noted above, Martinez asserts that she was not responsible for the decisions to transfer Chavez to LCCF on either occasion and that, in any case, she

14

had no knowledge that LCCF posed a substantial risk to Chavez. (Martinez Affidavit, at 2, 5).

Chavez alleges in his complaint that, in August or September 1998, both Serna and Martinez toured LCCF and were thereby made aware of the conditions under which PC inmates were held at LCCF. He also says that he spoke directly to Martinez on this occasion about the conditions of PC inmates, and she responded that she was aware of the situation. Serna says that he has visited LCCF in the past, although he has never toured the facility and has never visited the cells or housing units. He says he did not witness any problems at LCCF with regard to PC inmates and had no information that would have led him to believe that LCCF could not adequately handle PC inmates such as Chavez. (Serna Affidavit, at 2).

Martinez acknowledges that she toured LCCF and says that Chavez might very well have talked to her during this tour. However, she says he did not report any serious problems to her nor express a belief that he was in danger of being assaulted or killed, in any such conversation. (Martinez Affidavit, at 2). Although this assertion appears to create an issue of fact between Martinez's and Chavez's versions of this conversation, the complaint is quite vague on this point, with Chavez stating only that he "talked directly to Defendant Martinez about these problems and she said that she was aware." (Complaint, ¶ 55). Chavez does not state that he told Martinez that he was assaulted by Looney, or brutalized by guards, or kicked in the groin by another inmate while guards either assisted in the attack or stood by and did nothing. Martinez says she may well have spoken with Chavez, but she did not receive specific information from him about attacks or fear of attacks. This allegation regarding a conversation between Chavez and Martinez does not raise an issue of fact requiring a trial on the question of Martinez's knowledge.

As noted above, Chavez's first stay at LCCF ended on September 14, 1998. Following a

15

number of transfers to other facilities, Chavez was sent back to LCCF approximately a year later, on September 13, 1999. Chavez claims that this transfer, too, was done with deliberate indifference in that Defendants knew that LCCF could not adequately house PC inmates and keep them safe. Serna asserts in his affidavit that the Corrections Department made a decision that the majority of PC inmates in the state would be sent to LCCF and housed in a unit that was separate from the general population. Serna says that it was his judgment that the PC inmates would be safer if they were kept together at one facility. (Serna Affidavit, at 4-5).

With regard to his second stay at LCCF, Chavez alleges that he was assaulted on the bus on September 13, 1999 as he was being transported to LCCF, and that he has been subjected to constant threats from GP inmates in the form of yelling, kicking, spitting, throwing urine, lighting fires, and flooding his cell. On September 19, 1999, Chavez wrote again to Serna. The letter was read by Martinez. (Martinez Affidavit, at 5-6). Chavez stated in the letter that he "got into a fight on the bus with two inmates who were spitting and slapping me on the back of my head," and described how the other inmates continually yell death threats at him, and how he cannot participate in recreation or go to the showers. He requested that he be transferred back into long-term protective custody at Southern.

Upon receipt of this letter, Martinez spoke to the Associate Warden at LCCF about Chavez's complaints. She asked the warden to ensure that Chavez would be housed with other PC inmates, away from involuntary administrative segregation inmates who pose a threat of harm to others. She says that she did not want Chavez to feel threatened, and the purpose of her call was to prevent that from happening. (Martinez Affidavit, at 6). She wrote back to Chavez on October 13, 1999, telling him she had spoken to the warden, as described above. She also stated that Chavez would continue

16

to be housed at LCCF, as it currently houses almost all voluntary segregation inmates in the state. She said further that the majority of inmates at Southern are now security threat group members, and "[y]our placement at SNMCF would likely be most uncomfortable for you given the caliber of inmates now housed there." Martinez states she took these actions out of concern for Chavez's comfort and safety, and the first she learned of his dissatisfaction with her efforts was when she read his complaint in this lawsuit. (Martinez Affidavit, at 7).

This evidence does not demonstrate actions constituting deliberate indifference on the part of Serna or Martinez with regard to the decisions to transfer Chavez into LCCF in August 1998 and in September 1999, and to keep him there in spite of his request for a transfer to Southern. There is nothing to show that these Defendants had general information that LCCF was unable to care for PC inmates, nor is there any proof that Chavez specifically conveyed to Serna or Martinez that he was living under a risk of serious harm.

Chavez's first letter from LCCF, sent August 14, 1998, complained that he had been denied access to the law library and to recreational and other opportunities because of his PC status; however, he did not describe the incidents of violence which, he alleges in his complaint, occurred earlier in August, and he did not say that he felt unsafe or threatened at LCCF. The record does not show, and indeed Chavez does not specifically allege, that at the time of her tour of the facilities in August or September 1998, he told Martinez that he had been assaulted at LCCF or that he feared for his life.

His September 1999 letter, sent during his second stay at LCCF, does include a description of being spit on and hit on the back of the head, and being the target of insults, taunts, and other threatening behavior on the part of other LCCF inmates. However, the spitting and head-hitting,

17

described as occurring on the transport bus, do not rise to the level of serious harm, as required under the first prong of the Eighth Amendment test. And although the later yelling, kicking, fire-setting, and urine-throwing, as described by Chavez, might constitute a risk of serious harm so as to satisfy the first prong of the test, there is no indication that Serna was aware of these incidents, since he had delegated correspondence duties to Martinez, and no indication that Martinez responded to this information in a way that can be characterized as deliberate indifference. Indeed, her actions in response to this letter demonstrate a concern for Chavez's safety, rather than deliberate indifference. The Court concludes that there is no genuine issue of material fact with regard to Chavez's allegation that Serna and Martinez knew of, and acted with deliberate indifference toward, a substantial risk of serious harm to Chavez at LCCF.

Matters of inmate classification are generally seen as a facet of internal prison administration, and the Court will not interfere in matters of prison operations in the absence of a constitutional violation. Bell v. Wolfish, 441 U.S. 520, 562, 99 S. Ct. 1861, 1886 (1979). Defendants having made the requisite showing of a lack of genuine issue for trial on the Eighth Amendment issue, the motion for summary judgment should therefore be granted.

### Injunctive Relief

Serna and Martinez also argue that Chavez's request for injunctive relief should be denied in its entirety. In his prayer for relief, Chavez asks the Court to issue an injunction requiring Serna and Martinez to transfer Chavez immediately to a NMCD facility that will provide adequate protective custody, and to keep him in protective custody in a NMCD facility until his release from prison.[8]

---

[8] Chavez also sought an injunction against Defendant Robert Perry; however, Perry was dismissed from the lawsuit in the Judgment [Doc. 6] of April 13, 2000. In addition, Chavez's request for an injunction requiring the NMCD Defendants to provide him with reasonable access to a law library was

Defendants argue that Chavez has not established any of the four required elements of a claim for injunctive relief. Chavez did not respond to this argument in his briefing on this motion.

If, after the period for objections has expired, the District Court adopts this Recommended Disposition on the motion for summary judgment, and also adopts the recommendation on Serna's and Martinez's separate motion to dismiss other claims against them, these two Defendants will be dismissed from this case. In that event, Chavez's claims for injunctive relief will be moot. The Court therefore declines to address Defendant's arguments on this issue at this time, but will do so later, if Serna and Martinez remain as Defendants in the case.

### Recommended Disposition

That the NMCD Defendants' motion for summary judgment be granted.

                                              *Lorenzo F. Garcia*
                                              Lorenzo F. Garcia
                                              United States Magistrate Judge

---

mooted by the April 13 Judgment, which dismissed Chavez's claims relating to law library access.