IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

HENRY CHAVEZ,

        Plaintiff,

vs.                                                      No. CIV 00-92 LH/LFG

ROBERT PERRY, et al.,

        Defendants.

## MAGISTRATE JUDGE'S PROPOSED FINDINGS AND RECOMMENDED DISPOSITION ON TCDF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT[1]

THIS MATTER comes before the Court on the motion of Defedants Donald Dorsey ("Dorsey"), Bill Pennycuff ("Pennycuff") and Ramiro E. Rodriguez ("Rodriguez") for summary judgment [Doc. 67]. These defendants refer to themselves, and will be collectively referred to herein, as "the TCDF Defendants," based on their employment with the Torrance County Detention Facility (TCDF). Plaintiff Henry Chavez ("Chavez") filed a response, to which the TCDF Defendants have replied, and the motion is now fully briefed.

The factual background of Chavez's claims against the TCDF Defendants was set forth in an earlier Recommended Disposition [Doc. 45] and will not be repeated here, except to the extent necessary to recommend a resolution to this motion. In brief, Chavez contends that the TCDF

---

[1]**Within ten (10) days after a party is served with a copy of these findings and recommendations, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such findings and recommendations. A party must file any objections with the Clerk of the U.S. District Court within the ten-day period allowed if that party wants to have appellate review of the findings and recommendations. If no objections are filed, no appellate review will be allowed.**

Defendants were deliberately indifferent to his safety, in violation of his Eighth Amendment right to be free from cruel and unusual punishment, in that they "showcased" him as a protective custody inmate and failed to provide adequate protective custody at TCDF with the result that he was subjected to assaults both in his housing unit and in the prison law library.[2]

The TCDF Defendants previously moved for dismissal of Chavez's claims against each of them, arguing *inter alia* that he failed to allege their personal involvement in the incidents at TCDF which form the basis of his claim in Count II. The Court granted the motion to dismiss insofar as Chavez sought to recover from them on a claim of intentional infliction of emotional distress; however, the Court found that Chavez stated a claim under the Eighth Amendment for failure to provide adequate protective custody housing and security at TCDF, and that he alleged facts which, if proved, would be sufficient to justify punitive damages. [Doc. 45].

In so ruling, the Court noted that it "takes no position on the merits of Chavez's claims against Defendants Dorsey, Pennycuff, and Rodriguez, but holds merely that Chavez has made sufficient allegations to avoid dismissal. He is, of course, still charged with the burden of proving his allegations." [Id., at 9]. The TCDF Defendants now move for summary judgment, asserting that the undisputed facts show that they were not deliberately indifferent to Chavez's safety while he was incarcerated at TCDF, and there is no genuine issue of material fact for trial. The Court disagrees and recommends that the motion be denied.[3]

---

[2]Chavez makes repeated reference in his response brief to an alleged failure by these defendants to provide recreation and fresh air. Although there is a passing reference in ¶ 27 of his complaint regarding lack of recreation and fresh air at TCDF, he does not allege a constitutional deprivation in Count II based on these concerns, and they are not part of this case.

[3]Chavez also requests that he be allowed to conduct discovery. This request is premature, as there are several defendants who have not yet been served.

## Standards for Summary Judgment

A summary judgment proceeding is appropriately used to cut through the allegations of the pleadings and to determine if there is a triable issue. Summary judgment will be granted when the moving party can demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 90 S. Ct. 1598 (1970); Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co., 52 F.3d 1522, 1527 (10th Cir. 1995). The court does not decide issues of fact on summary judgment, but rather determines if there are any issues to be resolved at trial.

Summary judgment is appropriate only if there is insufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict for that party. Anderson v. Liberty Lobby, 477 U.S. 242, 249, 106 S. Ct. 2505, 2511 (1986). Thus, the court's inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id., at 251-52, 106 S. Ct. at 2512. The court, in considering a motion for summary judgment, construes the factual record and the reasonable inferences therefrom in the light most favorable to the party opposing the motion. Perry v. Woodward, 199 F.3d 1126, 1131 (10th Cir. 1999), *cert. denied,* 529 U.S. 1110, 120 S. Ct. 1964 (2000).

## Standards for Eighth Amendment Endangerment Claim

As noted above, Chavez alleges that Defendants failed to provide adequate protective custody housing and security at TCDF. A prisoner has the right to be reasonably protected from constant threats of violence from other inmates, and a prison official's deliberate indifference to a substantial risk of serious harm to a prisoner violates the Eighth Amendment. Riddle v. Mondragon, 83 F.3d 1197, 1204 (10th Cir. 1996). "Being violently assaulted in prison is simply not 'part of the penalty

that criminal offenders pay for their offenses against society.'" Id., *quoting* Farmer v. Brennan, 511 U.S. 825, 834, 114 S. Ct. 1970, 1977 (1994).

To recover on an Eighth Amendment claim for failure to protect, however, an inmate must allege and prove two elements: (1) that he is incarcerated under conditions posing a substantial risk of serious harm; and (2) that the defendant prison officials had a sufficiently culpable state of mind, indicative of deliberate indifference to the inmate's health and safety. Farmer, 511 U.S. at 834; Riddle, at 1204. There are genuine issues of material fact as to each of these elements, and as to each of these Defendants.

<u>Allegations of the Complaint</u>

Chavez alleges in his complaint that TCDF Warden Dorsey and Chief of Security Pennycuff allowed him to be "showcased" in protective custody, in such as way that he was identifiable to the general population as a protective custody inmate, and they knew that by housing him in such a manner, he would be subject to harassment and threats to his life from other inmates. (Complaint, ¶ 24).

He asserts that, because of this "showcasing," he was threatened on a daily basis by general population inmates who attempted to break into his housing unit, kicking, yelling, throwing objects and urinating under the doors and through cracks in the walls. He says that he advised Dorsey and Pennycuff of these threats on several occasions and requested housing in a more secure unit, but they failed to take steps to provide him with adequate protection, in spite of the fact that there were more secure units available. (Complaint, ¶¶ 26-28).

He further alleges that Dorsey ordered that the law library be moved from a secure area in the education department to the main hallway of the TCDF, knowing that general population inmates

could thereby enter the law library and mix with protective custody inmates. He asserts that Defendants knew that general population inmates would attack Chavez in the law library, if given the chance to do so, and that he was in fact assaulted on two separate occasions in the law library. He further alleges that Pennycuff failed to respond to his grievances regarding security issues in the library, and Rodriguez, the assistant warden at TCDF, was advised of the first assault but failed to investigate it, and further failed to protect Chavez from the second attack. He argues that Defendants' actions constitute deliberate indifference to his safety. (Complaint, ¶¶ 29-34).

The Parties' Evidence

In connection with his summary judgment motion, Dorsey submitted an affidavit in which he asserted that "at no time did I believe Plaintiff was in danger," "At no time did I believe the unit housing protective custody inmates was dangerous to the inmates in protective custody," and "At no time did Plaintiff advise me of threats or otherwise request different housing." (Ex. A to Doc. 68). Pennycuff stated in his affidavit that he did not believe that Chavez was in danger nor that the unit housing protective custody inmates was dangerous. (Ex. B to Doc. 68). Rodriguez stated in his affidavit that he "never believed Plaintiff was in danger while in protective custody" at TCDF. (Ex. C to Doc. 68).

In response, Chavez supplied his own sworn affidavit, asserting that "on several occasions, myself and several other inmates brought these matters to the attention of Defendants Dorsey, Pennycuff and Rodriguez." He states further with regard to the protective custody housing that:

> This pod was not built and designed to house ... protective custody inmates and because of its location and lack of security staffing, the general population (GP) inmates were allowed to come to this pod on a daily basis and kick and bang on the pod doors and windows in an attempt to gain access to the pod so that they could "kill the PC

5

> inmates" ...
>
> The GP inmates would constantly try to break into the PC pod and were now able to throw objects such as broken broom handles and urine through cracks of the unit walls, some of which hit me. On at least two occasions I had urine thrown on me and two other times, I was hit with a broken broom handle. Once on the left leg and once on the spine of my back. Although I requested to go to medical, I was unable to go due to lack of security to escort me to medical ...
>
> On several occasions, myself and several other inmates brought these matters to the attention of Defendants Dorsey, Pennycuff and Rodriguez ... In fact, I specifically remember showing each of these Defendants the large cracks in the unit walls. These Defendants acknowledged the need to have the cracks fixed but the problem never got corrected. I also advised Defendants Dorsey, Pennycuff ... to move the PC pod ac[r]oss the hall to pod 5-A which was empty and in a safer location. I remember Dorsey and Pennycuff say that it was a good idea, however, this to[o] was never done.

(Ex. A to Doc. 68, at 2-4).

Chavez also supplies the declaration of Leonard Shutco, who states that he was housed in the protective custody unit at TCDF in April 1998, and that he was "showcased" as a protective custody inmate with the result that he was threatened and harassed by general population inmates. He states further that he and other inmates, including Chavez, "personally talked to Warden Donald Dorsey, Bill Pennycuff, and Ramiro Rodriguez about all these conditions but nothing ever got done about it." He also asserts that the protective custody inmates had urine and objects thrown at them under the door of their unit and through cracks in the wall, and that "[t]his too was reported by all the inmates in this pod but nothing got done about it." (Ex. 2 to Ex. A to Doc. 68).

With regard to the assaults occurring in the law library as alleged in Chavez' complaint, Dorsey stated in his affidavit that "At no time was the law library at the TCDF moved." (Ex. A to Doc. 68). Pennycuff stated in his affidavit that Chavez never made any complaint to him about security in the law library. (Ex. B to Doc. 68). Rodriguez stated in his affidavit that in June and July

6

1998, protective custody inmates were not permitted in the law library at the same time as general population inmates. He also asserted that, during his rounds of the housing units, Chavez told him that he had been assaulted in the law library, but Chavez did not file a formal report nor did he provide Rodriguez with details about the alleged assault. Rodriguez says he told Chavez in response that if there had been an assault, an investigation would be conducted; however, he saw no visible signs of an assault at the time Chavez spoke with him about it and this, coupled with a lack of documentation of any assault, led him to conclude that no assault occurred. (Ex. C to Doc. 68).

In response, Chavez states in his affidavit that Dorsey's claim that the law library was not moved is "a lie." (Ex. A to Doc. 76). He continues:

> I was there when it was moved to the main hallway from the education department ... Somtime during the month of April, 1998, the law library was moved from the education department to the main hallway of the facility ... I was told by the law librarian, Ms. Trujillo-Lange, that the law library was moved per order of Warden Dorsey because to[o] many inmates were complaining of lack of access to it because of difficulties in escorts to the education department. Defendants Dorsey and Pennycuff later told me that the law library was moved to the main hallway so that all inmates could have access to it.
> Shortly after the law library was moved, I had a talk with Pennycuff in his office about many security issues including the law library. I told Pennycuff that PC [protective custody] inmates were not safe while in the law library in its new location. I even remember discussing with Pennycuff a few ideas I had that would help with the security problem ... I even addressed these security issues in a grievance ....
> As a result of the CCA Defendants' failure to take any protective measures, and despite the obvious need to do so, I was assaulted by two GP [general population] inmates on or about June 20, 1998. These two inmates punched and kicked me several times and then quickly ran out of the law library.

(Ex. A to Doc. 76). Chavez further alleges that he was not allowed to go to the medical clinic after

7

the assault. He states that, on or about June 24, 1998, he told Rodriguez about the assault in the law library. Chavez says that Rodriguez asked him for the names of the inmates who had attacked him, but that he could not supply this information because he didn't know their names. He says Rodriguez' response was to ask him, "Who are you to tell me how to run this prison?" and that he failed to investigate the incident.

Chavez includes with his response brief a memorandum written by Rodriguez in which he states that, on June 24, 1998, Chavez reported an incident in the law library "where his safety was threatened and he fears for his safety at this time and refuses to go to the law library." Rodriguez says that he asked Chavez to release details of the incident, including names of the attackers, so that an investigation could be conducted, but Chavez refused to do so. (Ex. 7 to Ex. A to Dock. 76). Chavez filed a grievance on June 27, 1998, stating that he advised Rodriguez of the June 20 incident and, when Chavez told Rodriguez that he didn't know the names of the attackers, Rodriguez stated he didn't believe Chavez, and no investigation was ever conducted. He says in the grievance that he also advised Pennycuff of the June 20 assault. (Ex. 8 to Ex. A to Dock. 76). There is no indication in the materials supplied by either party of a response to this grievance.

Chavez also states in his affidavit that he was assaulted again in the law library on July 25, 1998, when two inmates from the general population entered the library and violently attacked him and another inmate named Matt Kelly. He says he was taken to the medical clinic where photographs were taken of his injuries.

Leonard Shutco, another protective custody inmate, asserted in his declaration that on or about July 25, 1998, he witnessed several scratches and bruises on Chavez' back after Chavez returned from the law library. (Ex. 2 to Ex. A to Dock. 76). In addition, Chavez submitted a medical

report and an "Injury to an Inmate Worksheet" indicating that he was treated in the medical clinic following an altercation with another inmate and was treated for minor abrasions to his right armpit. (Ex. 10 to Ex. A to Doc. 76). He was seen again in the medical clinic on July 26, complaining of pain in his ribs and difficulty breathing, and exhibiting bruises, scrapes, and sore muscles. He was given an analgesic balm. (Id.; Ex. A to Doc. 76, at 12).

These affidavits create a factual dispute as to what Defendants Dorsey and Pennycuff knew about assaults with urine and other objects in the housing pod, and whether they were aware of the danger to the protective custody inmates arising from "showcasing" their protective custody status, the proximity of protective custody and general population inmates, and any actual injuries arising from objects or other material thrown under the door and through cracks in the wall. The evidence submitted by the parties also creates issues of fact as to whether all three Defendants were aware of a dangerous situation in the law library and failed to take steps to protect Chavez and other protective custody inmates from assault.

Defendants argue that, to the extent that Chavez's claims of danger in the housing unit are related to mere verbal threats, they fail to satisfy the first element of the Farmer test, that the deprivation alleged must be, objectively, sufficiently serious to warrant judicial intrusion. The Court agrees that mere verbal threats are generally insufficient to meet the Farmer test. Barney v. Pulsipher, 143 F.3d 1299, 1310 n.11 (10th Cir. 1998). "[T]the plaintiff's allegations must furnish more than a conclusory claim of being afraid and aggravated." Riddle, at 1205. However, in this case, Chavez alleges more than mere verbal threats; his constitutional claim is based on an allegation that he was regularly assaulted under the door and through cracks in the walls and was hit with objects and substances, including urine, thrown or otherwise projected his way.

9

This goes beyond the situation found insufficient to raise a constitutional issue in Grimsley v. MacKay, 93 F.3d 676, 681 (10th Cir. 1996). The Grimsley incident was anomolous and involved an inmate who was "safely locked behind the steel door of his cell." In the present case, Defendants argue, Chavez was "safely locked behind the door of his housing unit when the threats and taunts were made." But Chavez claims he was not safe in the unit, that it was accessible under the door and through cracks in the wall, and that he was hit more than once by flying objects and substances. Inmate Shutco confirms Chavez' assertion. He states in his declaration that the protective custody inmates at TCDF were subjected to regular bouts of banging, kicking and threats, that objects and urine were thrown under the door and through cracks in the walls and that several inmates were hit, and that "[t]his too was reported by all the inmates in this pod but nothing got done about it." (Ex. 2 to Ex. A to Doc. 76).

This situation and Defendants' awareness of it, if proved at trial, falls below the standard of "the minimal civilized measure of life's necessities." Grimsley, at 681.

> This is an objective standard. Such conditions have been found to exist where prison officials disregard repeated warnings of danger to a particular prisoner and continually refuse to make the situation safer, for example by ... separating the prisoner from other inmates who previously have attacked him on multiple occasions ... In such cases, prison officials have a constitutional duty to take reasonable measures to protect prisoners against current threats of attack and other sufficiently imminent dangers likely to cause harm.

Id. (internal punctuation omitted).

The attacks in the housing unit as well as the assaults in the library, if proved, are sufficiently serious to satisfy the first prong of the Farmer test. There is also an issue of fact related to the second element of the Farmer test, which requires that the plaintiff show a culpable state of mind on the part

10

of the defendant, that is, deliberate indifference to the inmate's safety. "Deliberate indifference" means that the prison official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837.

Dorsey states that Chavez never advised him of threats or otherwise requested different housing, and that he did not believe that Chavez was in danger at any time during his stay at TCDF. Pennycuff states that Chavez never complained to him about the law library, and that he did not believe that Chavez was in danger at any time. Rodriguez says that Chavez did tell him he had been assaulted in the law library, but he did not investigate the incident because there was no indication, and he did not believe, that such an assault actually occurred. Rodriguez, too, states that he never believed that Chavez was in danger while in protective custody at TCDF. (Exs. A-C to Doc. 68). However, this does not establish, as a matter of law, that Defendants were not "deliberately indifferent" to danger to Chavez. Chavez has presented evidence that Defendants were informed on numerous occasions by himself and others, and that Defendants were otherwise aware, of dangerous conditions in the housing unit and the library, and that they refused to investigate and failed to take any action to correct these conditions. These factual disputes cannot be resolved on summary judgment.

Although "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment," summary judgment is appropriate only if the evidence favoring the nonmoving party is so inadequate that a jury could not return a verdict for that party. Anderson v. Liberty Lobby, 477 U.S. at 247-49. The evidence must be viewed in the light most favorable to the nonmoving party. "[T]his Court's inquiry is 'whether the

11

evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." BancOklahoma Mortgage Corp. v. Capital Title Co., 194 F.3d 1089, 1097 (10th Cir. 1999), *quoting* Anderson, 477 U.S. at 251-52.

The Eighth Amendment issue, at this point, turns on which witnesses a jury would find more credible. This is not a determination which the Court can make at the summary judgment stage. "The court 'may not make credibility determinations or weigh the evidence,' and 'must disregard all evidence favorable to the moving party that the jury is not required to believe.'" Gossett v. Oklahoma ex rel. Bd. of Regents for Langston Univ., 245 F.3d 1172, 1175 (10th Cir. 2001), *quoting* Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 120 S.Ct. 2097, 2110 (2000).

**Recommended Disposition**

That the Motion for Summary Judgment [Doc. 68] submitted by Defendants Dorsey, Pennycuff, and Rodriguez, be denied.

_____
Lorenzo F. Garcia
United States Magistrate Judge